IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Dean Scott Johnson and<br>James R. Render,<br><br>               Plaintiffs,<br><br>v.<br><br>Scott Knight, individually and in his capacity as the Chief of Police for the City of Chaska, and the City of Chaska,<br><br>               Defendants. | Court File No. _____<br><br>**COMPLAINT AND<br>JURY TRIAL DEMAND** |

## COMPLAINT

For their Complaint against Defendants, Plaintiffs Dean Scott Johnson and James R. Render state and allege as follows:

### PARTIES

1. Plaintiff Dean Scott Johnson ("Mr. Johnson") is a resident of the State of Minnesota.

2. Plaintiff James R. Render ("Mr. Render") is a resident of the State of Minnesota.

3. Defendant Scott Knight ("Chief Knight") is Chief of Police for the City of Chaska and upon information and belief is a resident of the State of Minnesota.

4. Defendant City of Chaska (the "City") is a municipality organized under the laws of the State of Minnesota.

## BACKGROUND FACTUAL INFORMATION

5. On Sunday October 2, 2016, the final day of the Ryder Cup golf competition at Hazeltine National Golf Club ("Hazeltine National") located within the City of Chaska at approximately 3:15 p.m., Mr. Johnson, a licensed pilot, landed a float plane on Lake Hazeltine. The lake lay adjacent, immediately to the north of Hazeltine National.

6. Mr. Render was a passenger in the float plane.

7. Mr. Johnson did not fly over Hazeltine National property or any area where spectators were gathered. He approached the lake from the northwest (opposite the golf club property) and carefully landed the plane in the middle of the lake. Mr. Render and Mr. Johnson anchored the plane several hundred yards from shore and did not attempt to enter Hazeltine National property after landing.

8. Prior to taking flight on October 2, 2016, Mr. Johnson checked with the FAA and other regulatory authorities to determine whether the airspace around Lake Hazeltine was restricted – it was not.

9. Mr. Johnson called Flight Service on Saturday October 1 and Sunday October 2, 2016. Flight Service is an arm of the FAA that operates air traffic facilities to communicate with pilots regarding preflight briefings, flight plan processing and to provide other services to pilots. Flight Service confirmed to Mr. Johnson there were no air space restrictions on or around Lake Hazeltine on October 2, 2016.

10. Mr. Johnson also searched online with the Minnesota Departments of Transportation and Natural Resources before flying on October 2 to determine whether these agencies had restricted access to Lake Hazeltine in any manner during the Ryder Cup. He learned from the DNR website that that Lake Hazeltine is listed as a "public lake," authorized and approved for sea-plane (float-plane) operations. There were no notices on the website that the DNR had restricted access to Lake Hazeltine during the Ryder Cup.

11. Upon information and belief, no other regulatory body or municipality had jurisdiction or authority to restrict a plane from landing on Lake Hazeltine on October 2, 2016. Because there were no regulatory restrictions preventing the landing of a float-plane on Lake Hazeltine, and based upon the fact Lake Hazeltine is a public lake, Mr. Johnson and Mr. Render set out on their flight on October 2, 2016. Mr. Johnson safely landed the plane on Lake Hazeltine as described above at approximately 3:15 p.m.

12. After sitting on the plane for approximately an hour without causing any disturbance or problem, Plaintiffs noticed a small row-boat approaching the plane. Two law enforcement officers in full police uniform were in the boat. Rather than flying off, which would have been an option, Mr. Render and Mr. Johnson waited patiently for the officers to make their way to the plane.

13. One of the officers questioned Plaintiffs about their actions. Mr. Johnson told the officer that he and Mr. Render were legally entitled to be on Lake Hazeltine.

14. The officer asserted that Plaintiffs were violating a City Ordinance.

15. Mr. Johnson responded that he was unaware of any ordinance that prevented him from landing his plane on Lake Hazeltine because any local ordinance would not apply to aircraft that had access to a legal landing area.

16. The officer then said Plaintiffs "could argue the constitutional issues in court," but for now his Chief said they were to be removed from the aircraft and were to be taken to the "Security Center" to meet with Chief Knight.

17. The two officers both carried guns and did not give Plaintiffs any choice but to comply with their orders.

18. The two officers took Plaintiffs to shore in the little row-boat, one by one, Mr. Johnson first and then Mr. Render.

19. Instead of taking Mr. Johnson and Mr. Render to the Security Center on the Hazeltine National property, they instead took Mr. Johnson and Mr. Render to a house along the lake and ordered them to stay in the back yard of the property.

20. Other officers believed to be controlled or employed by Chief Knight and the City of Chaska arrived in squad cars, bringing the total number of officers present to five or six. The officers essentially surrounded Plaintiffs – one officer was always very close to Mr. Johnson and Mr. Render, and the others stood blocking Plaintiffs' ability to leave or move around on the property.

21. As the afternoon progressed, the plan from Chief Knight changed several times but Mr. Johnson and Mr. Render were prevented from leaving the area where they were being held, and were forced to remain there by Chief Knight's armed officers.

22. Throughout the afternoon, the officers informed Plaintiffs they were being directed by Chief Knight.

23. Mr. Johnson asked if he could be returned to the plane and so he could fly it off the lake before sundown. One of the officers asked Mr. Johnson what time he would need to get to the plane to leave that evening. Mr. Johnson replied he would need to be at the plane before 7:00 p.m.

24. The officer spoke with Chief Knight and informed Mr. Johnson that he would not be allowed back to the plane until the event was over and the fans had left. The officer indicated this would be 4:30 to 5:00 p.m. Mr. Johnson said that this would work as long as he could leave by 7:00 p.m. The officer returned after speaking with Chief Knight and said he was told the grounds would not be cleared until after 7:00 p.m. and that Mr. Johnson would not be allowed to move the plane that day.

25. In effect, Chief Knight directed that Mr. Johnson not be allowed to return to the plane on October 2, 2016 and that instead he had to leave the plane anchored on the lake overnight.

26. Mr. Johnson and Mr. Render were held at the house on Lake Hazeltine until the Ryder Cup play ended at approximately 5:00 p.m. They were then issued citations.

27. The Citation issued to Mr. Johnson indicates he was charged with Unsafe Conditions and Endangering Life or Property. The ordinance cited was 918.5(A) – No Boat or Floating Device on Lake Hazeltine.

28. No facts supported any of these allegations. October 2, 2016 was a cloudless, nearly windless, beautiful day and because of the way the plane was landed, there were no unsafe conditions whatsoever.

29. When Mr. Johnson asked the officer why he checked the "Endangering Life or Property" box on the citation, the officer stated "because there were people nearby."

30. Contrary to this assertion, the plane was never over Hazeltine National property or spectators. So, no facts supported this charge in the Citation.

31. Mr. Render also was charged with an ordinance violation, but not with creating an unsafe condition or endangering life or property.

32. Upon information and belief, the City of Chaska had no jurisdiction over Lake Hazeltine to prevent boats or floating devices to be on the lake during the Ryder Cup.

33. The officers who removed Plaintiffs from the plane and who held them in custody informed them around 5:00 p.m. that they were being released. The officers told Plaintiffs they would not give them a boat ride back to the plane, that the plane could not be flown off the late that day and that Mr. Johnson would be on his own to get to the aircraft the next day. The officers also told Plaintiffs they could drive Plaintiffs to a location in Chaska, but could not bring them outside the city limits.

34. The officers dropped Mr. Johnson and Mr. Render at a McDonald's near Hazeltine National. By the time Plaintiffs were able to arrange rides home and arrive at their homes, it was too late to return and get the plane off the lake. Consequently, the plane remained unsecured and anchored on Lake Hazeltine overnight until Mr. Johnson was able to get to it the next day, Monday October 3, 2016.

35. Reporters noted that Plaintiffs were detained after landing on Lake Hazeltine. Chief Knight made several statements to the press that he knew were untrue and that harmed the reputations of Mr. Render and Mr. Johnson. For example, Chief Knight asserted that flying the plane over the lake and landing it on the lake violated airspace restrictions, violated FAA rules and that Mr. Johnson, the pilot, would be questioned and sanctioned by the FAA for his actions.

36. These statements were knowingly untrue – Mr. Johnson spoke with an FAA representative weeks after the incident who told him that the City of Chaska applied for FAA airspace restrictions during the Ryder Cup event, but the request was denied. Mr. Johnson also determined several weeks after the incident that the City of Chaska did not request that the DNR (the agency with actual lake jurisdiction) limit the access to or use of Lake Hazeltine during the Ryder Cup event. So there was no basis for Chief Knight's statements to the press concerning Mr. Johnson, including those calling his actions "imbecilic" and "stupid."

37. The story concerning Plaintiffs was widely reported and the comments on the stories were numerous. Social media and television news identified Plaintiffs as the individuals who were involved in the incident and there were many postings on Facebook and other social media sites about the incident. In a news report, the FAA was quoted as saying it would investigate the incident and contacted Mr. Johnson by phone approximately four weeks after the incident, but took no action.

38. Because of the incident, the comments by Chief Knight and the reporting, Plaintiffs were forced to answer many embarrassing questions and spent many sleepless

nights worrying about how the publicity around the incident would harm their reputations from both a business and personal standpoint.

39. Defendants' actions also caused much anxiety – especially related to the way in which Chief Knight informed the public the plane would be sitting on the lake overnight and that he would not allow Mr. Johnson to retrieve it until the next day. The plane easily could have been damaged, vandalized or stolen. Mr. Johnson was particularly concerned because he did not own the plane.

40. Plaintiffs experienced and suffered emotional harm by being wrongfully arrested and held without any reasonable or justifiable basis by law enforcement officers under the direction of Chief Knight and the City of Chaska.

41. Plaintiffs' reputation and standing in the community was harmed as a result of being wrongfully accused of criminal conduct, and by Chief Knight's statements.

42. The City dropped and dismissed all charges against Plaintiffs brought in the citations referenced above. No other or new charges have been brought against Plaintiffs by the City of Chaska or any other prosecuting authority related to the October 2, 2016 incidents described above.

## COUNT I
## VIOLATION OF CIVIL AND CONSTITUTIONAL RIGHTS

43. Paragraphs 1 through 42 as set forth above are incorporated herein by reference as though set forth in full.

44. Under 42 USC § 1983 (Section 1983), individuals like Plaintiffs have a legal remedy for the violation of any rights, privileges or immunities secured by the United States Constitution. *See, e.g., Lynch v. Household Fin. Corp.*, 405 U.S. 538 (1972).

45. The Fourth Amendment to the U.S. Constitution prevents government officials acting under color of state law from "seizing" individuals without reasonable suspicion or "arresting" or "charging" them without probable cause. Measures short of an arrest may count as seizures for Fourth Amendment purposes. "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio,* 392 12 U.S. 1, 16 (1968) For instance, "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' . . . ." *Whren v. United States,* 517 3 U.S. 806, 809 (1996). Such stops require "reasonable suspicion," which is assessed by reference to the "totality of the circumstances." *Terry,* 392 U.S. at 21-22. "Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting," *U.S. v. Cortez*, 449 2 U.S. 411, 417 (1981), that the specific person they stop "has committed, is committing, or is about to commit a crime," *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). The test is an objective one; "subjective good faith" does not suffice to justify a stop. *Terry*, 392 U.S. at 22.

46. In the case involving Plaintiffs, neither Chief Knight nor the officers he was directing had any objective or reasonable basis to believe Mr. Render or Mr. Johnson had committed or were about to commit a crime. There were no airspace restrictions preventing Plaintiffs from landing the float-plane on Lake Hazeltine. The lake is a "public lake" open

to sea-plane operations and the DNR, which has jurisdiction over the lake, was not asked to issue an order or directive limiting or preventing activities on the lake during the Ryder cup. Plaintiffs' actions did not endanger the public in any manner. Chief Knight and the officers he was directing were fully and completely aware, or should have been aware, there was not a single ordinance or regulation that Mr. Render or Mr. Johnson violated when they landed the plane on Lake Hazeltine.

47. Despite this knowledge, Chief Knight and his officers clearly "seized" Plaintiffs. Mr. Johnson and Mr. Render were removed from the plane and taken by boat to a location where they were contained and held for over two hours by armed officers. They were not free to leave while they were being held. Before they eventually were released, they were charged with crimes that had no factual basis, and the charges ultimately were dismissed. Moreover, the plane was seized and Chief Knight prevented Mr. Johnson from retrieving the plane, leaving it unsecure overnight and subject to theft or vandalism.

48. Because Plaintiffs were seized in violation of the Fourth Amendment Rights by Chief Knight and officers under his direction while acting under color of state law (i.e., as the chief law enforcement official for the City of Chaska), Plaintiffs have a civil rights claim under Section 1983.

49. Additionally, Plaintiffs may bring claims under Section 1983 because they effectively were "arrested" without probable cause.

50. Similarly, they were charged with ordinance violations when there was no probable cause for the charges that were issued.

51. And, the plane effectively was seized without any justification or reasonable basis.

52. As a direct and proximate result of Defendants' actions, Plaintiffs have experienced damages, including pain, suffering and emotional distress, in an amount reasonably believed to be $225,000.

53. Punitive damages are available against Chief Knight for his callous and indifferent attitude toward Plaintiffs and his apparent desire to try punish them, despite any legal authority to take action against them. *See Smith v. Wade* 461 U.S. 30 (1983). Punitive damages are hereby claimed as a matter of federal common law.

54. Pursuant to 42 U.S.C. § 1988, Plaintiffs are entitled to recover their costs, including reasonable attorneys' fees.

## COUNT II
## DEFAMATION – SLANDER AND LIBEL

55. Paragraphs 1 through 54 as set forth above are incorporated herein by reference as though set forth in full.

56. Defendants and their agents published verbally and/or in writing, false and unprivileged communications concerning Plaintiffs that were intended to injure and did injure Plaintiffs with respect to their profession and occupation, as well as their individual reputations. These publications, as set forth above, include, but are not limited to the following:

    a.    Chief Knight asserting that flying the plane over and landing on Lake Hazeltine violated air space restrictions and FAA rules, and that Mr. Johnson would be sanctioned by the FAA; and

  b. Chief Knight calling Mr. Johnson's actions imbecilic.

57. Defendants' false statements concerning Plaintiffs were the direct and proximate cause of Plaintiffs' reputation being harmed, and Plaintiffs experiencing great embarrassment and emotional distress.

58. As a direct and proximate result of Defendants' actions, Plaintiffs have experienced damages, including pain, suffering and emotional distress, in an amount reasonably believed to be $225,000.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury.

## DEMAND FOR JUDGMENT

Plaintiffs demand judgment against Defendants as follows:

1. A monetary Judgment against Defendants for compensory and punitive damages in an amount of $225,000.

2. Costs and disbursements, including reasonable attorneys' fees under 42 U.S.C. § 1988, as well as prejudgment interest.

3. For such other and further relief as the Court shall deem just and proper.

|  |  |
|---|---|
| | HOVLAND & RASMUS, PLLC |
| Dated: _Nov 1, 2017_ | By: _/s/ Dan Rasmus_ |
| | Dan Rasmus (#260289) |
| | Southdale Office Centre |
| | 6800 France Avenue South, Suite 190 |
| | Edina, MN 55435 |
| | Telephone: (612) 874-8550 |
| | Facsimile: (612) 874-9362 |
| | Email: drasmus@hovlandrasmus.com |

**ATTORNEY FOR PLAINTIFFS**